Filed 6/17/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>DEIDRA ALLEN,<br><br>  Defendant and Appellant. | 2d Crim. No. B254084<br>(Super. Ct. No. MA053343)<br>(Los Angeles County) |

Deidra Allen appeals her conviction by jury of two counts of premeditated attempted murder (Pen. Code, §§ 664, subd. (a)/187, subd. (a))[1], assault with a deadly weapon (§ 245, subd. (a)(1)), and burglary (§ 459) with special findings that she personally used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1). The trial court denied probation and sentenced appellant to two concurrent life terms plus seven years state prison. Appellant contends that the trial court erred in denying her *Batson/Wheeler* motions (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258) after the prosecutor exercised peremptory challenges to excuse three African-American female prospective jurors who had close family members with mental health issues. We affirm.

---

[1] All statutory references are to the Penal Code.

*Facts*

Appellant, a jealous and spurned lover, devised an intricate plan to murder her boyfriend's common law wife and three-year-old son. The plan was so bizarre that the prosecutor was concerned that jurors would perceive appellant to be suffering from mental health issues and sympathize with her.

In 2010, Mynor Plato had an affair with appellant. Plato lived with Maria (Angie) Vasquez and their son, G. Appellant wanted an exclusive relationship and, in October 2010, told Angie that she and Plato were having sexual relations. After Angie and G. moved away, appellant left messages on Angie's phone to remind her that appellant and Plato were still seeing each other. Some of the voicemail messages included recordings of appellant and Plato having sex.

Plato reconciled with Angie which angered appellant. Appellant had someone tell Plato that she had killed herself. After Plato moved Angie and G., to Lancaster, appellant reappeared and told Plato that she was pregnant with his child. Appellant visited Plato at work and called him incessantly.

On the morning of July 1, 2011, after Plato left for work, appellant "banged" on his front door wearing a John McCain mask. Plato's cousin, Liliana Garcia, opened the door. Appellant forced her way in and struck Liliana in the face with a heavy toy gun. Appellant was wearing a white jumpsuit and gloves, a construction utility belt, a wig and sunglasses. Under her clothes, appellant wore a fake baby bump so she looked pregnant. Appellant had a clipboard with notes, a digital recorder, two pairs of handcuffs, and a plastic bottle of white liquid.

Liliana, Liana's daughter, and the daughter's fiancé restrained appellant while Angie called 911. Before the sheriff arrived, appellant asked for the plastic bottle back and poured the liquid out. Sheriff's investigators determined that the bottle had trace amounts of Zolpidem (Ambien) and morphine.

Sheriff's deputies found a Toyota Camry parked nearby with tape over the license plates and the vehicle identification number. The car keys, a laptop, a car rental contract signed by "D. Allen," appellant's purse, two cell phones, a receipt for the John

2

McCain mask, and a notebook were in the trunk. Sheriff's deputies also found a prescription for Zolpidem and phone memory cards with sonogram videos of a pregnant woman and a video of appellant and Plato having sex. The digital recorder, which was on appellant's person, had a recording in Spanish. The recording instructed Angie to drink the liquid in the plastic bottle and leave a voicemail that G. was Plato's son and that Angie could not live like this anymore. The recording included a checklist for appellant to follow and stated that once Angie was drugged, appellant would smother G. and kill Angie so it looked like a murder-suicide.

### Batson/Wheeler

Appellant, an African American woman, argues that the trial court erred in denying her *Batson/Wheeler* motion after the prosecutor excused two female African-American prospective jurors. The trial court denied the motion because there was no prima facie showing of purposeful discrimination. When the prosecutor exercised a peremptory challenge to excuse a third African-American female prospective juror, appellant renewed the *Batson/Wheeler* motion. Denying the motion, the trial court stated: "I don't find that the challenges are race based at this point. They seem to be race neutral reasons."

The use of peremptory challenges to remove prospective jurors based solely on race violates both the federal and state Constitutions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1313.) The question of whether a peremptory challenge has been improperly exercised requires a three-step *Batson* inquiry. (*Ibid*.) " 'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional clams.' [Citation.]" (*Ibid*.)

We analyze appellant's *Batson/Wheeler* contentions in detail:

3

*Prospective Juror 6478*

Prospective Juror 6478, an African-American female was a police captain and was married to a sergeant in the Los Angeles Police Department. She had three children: a fitness instructor, a child psychologist, and a college student. The juror stated that her brother had drug related convictions and that the brother's sons had convictions for unknown offenses. The prosecutor excused Prospective Juror 6478 after the juror stated that her daughter had a history of mental illness and that her ex-husband cheated on her.

*Prospective Juror 8006*

Prospective Juror 8006, a single African-American female, had no children, lived in Lancaster, and worked as a healthcare provider. The juror had family members who had been charged with crimes but did not know what the crimes were. The prosecution used a peremptory challenge to excuse Prospective Juror 8006 after she stated that her aunt had a history of mental health issues and "I don't know if my mom . . . does."

*Prospective Juror 2341*

Prospective Juror 2341, an African-American female, was married, worked as a school bus driver, and had a four-year-old son. Members of the juror's family, including her father, brother, and cousin, had prior arrests for crimes she could not recall. The juror knew of friends and family members who had extra-marital affairs. The prosecutor struck Prospective Juror 2341 after she stated that she was close to an uncle and a cousin who suffered from mental health issues.

*First Batson/Wheeler Motion*

After the prosecutor used his second and fourth peremptory challenge to excuse Prospective Jurors 6478 and 8006, defense counsel made a *Batson/Wheeler* motion on the ground that "two of the peremptories have gone to African American females. My client Deidra Allen is an African American female." Counsel argued that Prospective Juror 6478 was a police captain and "seemed like a very solid

4

juror . . . . " Counsel argued that Prospective Juror 8006 was African- American and her answers on voir dire "were not in any way extreme or out of the ordinary . . . . "

The trial court ruled that appellant had not established a prima facie case of discrimination and asked the prosecutor if he wished to be heard. The prosecutor explained that Prospective Jurors 6478 and 8006 were excused because they had close family members with mental health problems. It was a concern because appellant's criminal acts were "very out of the ordinary. She's wearing a John McCain mask when she goes to commit this crime. She is pretending to be pregnant. She has a fake baby bump on. I don't want any of the jurors sympathizing with people they perceive to have mental health issues. That is why I specifically asked the question, does anybody have close family members or friends who have suffered from mental health issues[?] [¶] And it happens that the four people who have said yes to that question are African American females. [¶] So there are two that I have already kicked. And just to give the court some notice, I do plan on kicking the other two that have had family with mental health issues. [¶] In addition to that, [Prospective Juror No. 6478's] husband had . . . an affair on her . . . . "

Where the trial court denies a *Batson/Wheeler* motion based on defendant's failure to make a prima facie showing of group bias, we review the record to determine whether there is substantial evidence to support the ruling. (*People v. Griffin* (2004) 33 Cal.4th 536, 555.) Because the *Batson/Wheeler* motions call upon a trial judge's personal observations, the ruling is given considerable deference on appeal. (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

The trial court correctly found that the peremptory challenge of two African-American females, standing alone, did not make a prima facie case of purposeful discrimination. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 342-343 [prosecutor struck the only two African-Americans in a 78-person jury pool; no prima facie showing of purposeful discrimination]; *People v. Farnam* (2002) 28 Cal.4th 107, 134-135 [peremptory challenge against five prospective jurors, four of which were African-American, did not make a prima facie showing of racial bias]; *People v. Arias* (1996) 13

5

Cal.4th 92, 136, fn. 15 [assertion of group bias based on number and order of minority exclusion and final jury composition did not establish prima facie case]; *People v. Bell* (2007) 40 Cal.4th 582, 597-598 [no inference of discrimination where prosecutor excused two out of the three African–American women on jury panel].)

"[T]he only bases for establishing a prima case cited by defense counsel were that all of the challenged prospective jurors were Black and either had indicated that they could be fair or impartial or in fact favored the prosecution. This is insufficient. [Citations.]" (*People v. Turner* (1994) 8 Cal.4th 137, 167, overruled on other grounds in *People v. Griffin, supra,* 33 Cal.4th at p. 555, fn. 5.) Although African-American women constitute a cognizable group, the challenge of one or two prospective jurors rarely suggests a pattern of impermissible group bias. (*People v. Bell, supra,* 40 Cal.4th at p. 598.) That is the case here. When appellant made the first *Batson/Wheeler* motion, two African-American women and an African-American man were still seated on the jury. The trial court noted that "the other two jurors that were kicked [by the prosecution] were -- 7039 was a female white. And 6083 was a male white."

The trial court invited the prosecutor to "preserve the record" and state his reasons for excusing the two female African-American jurors. This is the preferred practice but not required. (*People v. Scott* (2015) ___ Cal. 4th ___ [2015 DJDAR 6230, 6237]; *People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13.) It did not convert what was a first-stage *Batson/Wheeler* case into a third-stage case. (*People v. Taylor* (2010) 48 Cal.4th 574, 616.) "[T]he prosecutor's race-neutral reasons for the excusals confirmed the trial court's finding that there was insufficient evidence to permit the court to draw an inference that discrimination had occurred." (*People v. Hawthorne* (2009) 46 Cal.4th 67, 80.) The trial court did not err in finding that appellant failed to establish a prima facie case of discrimination. (*People v. Scott, supra,* __ Cal.4that p. ___ [2015 DJDAR at p. 6239].)

*Second Batson/Wheeler Motion*

After the prosecutor used his next peremptory challenge (fifth peremptory challenge) to excuse Prospective Juror No. 2341, appellant made a second

6

*Batson/Wheeler* motion. Defense counsel argued that "[j]uror 6478 [and] juror 8006, both African-American females, . . . were excused by the prosecution. [¶] Now their next, or their 5th, peremptory goes to juror 2341, an African-American female. . . . [S]he is a school bus driver. Hasn't been on a jury. She said that yes, she's had family members that were arrested but she told your honor in her opinion they were treated fairly. [¶] . . . There is a reasonable inference these challenges are being exercised for not acceptable reasons."

The prosecution responded that "the biggest issue in my case is a jury feeling some sort of sympathy towards the defendant or speculating that she may have some sort of mental health issue. [¶] I have specifically asked -- the court has followed up on my original question of mental health. The reason that I . . . asked that question is because that is the biggest issue in my case. [¶] Juror Number 2341 said that her uncle and her cousins have had mental health issues. In addition to that, she did say that her family had been arrested."

Denying the *Batson/Wheeler* motion, the trial court found that appellant had not established a prima facie case and that the peremptory challenges were based on race neutral reasons.

Appellant contends that the use of three peremptory challenges to strike female African-American prospective jurors supports the inference of purposeful racial discrimination.[2] (*Johnson v. California* (2005) 545 U.S. 162, 170 [162 L.Ed.2d 129, 139].) The argument fails because the peremptory challenges were race-neutral. After Prospective Jurors 6478, 8006, and 2342 were excused, two African-American women

_____

[2] The difference between *Wheeler* and *Batson,* if any, concerns the standard for determining whether a prima facie case of group bias has been shown. *Wheeler* requires a "strong likelihood" of discrimination while *Batson* states that a reasonable "inference" is sufficient. (*People v. Wheeler, supra,* 22 Cal.3d at p. 280; *Batson v. Kentucky*, *supra,* 476 U.S. at p. 96 [90 L.Ed.2d at p. 89].) A reasonable inference is established "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 138].)

and an African-American man remained on the jury.  An African-American man was also selected as an alternate juror.  (See e.g., *People v. Taylor* (2010) 48 Cal.4th 574, 614-615 [after prosecutor excused one African-American prospective juror, another African-American female was seated on jury; no inference of discriminatory purpose].)  When the *Batson/Wheeler* motions were argued, appellant did not respond to or challenge the prosecutor's stated reasons for excusing the jurors.[3]  The burden of persuasion to prove the existence of purposeful discrimination " 'rests with, and never shifts from, the opponent of the strike.' [Citation.]"  (*Johnson v. California, supra,* 545 U.S. at p. 171 [162 L.Ed.2d at p. 139].)  On appeal, it is presumed that the prosecutor exercised the peremptory challenges in a constitutional manner.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 76.)

Employing a "comparative juror analysis," appellant argues, for the first time on appeal, that the prosecutor's explanation was pretextual because the prosecutor did not strike Prospective Juror 4783 who, on voir dire, said that she was depressed after her ex-fiancé cheated on her.  The prosecutor also declined to strike Prospective Juror No. 2028 who reported that the brother of her sister-in-law was schizophrenic.

---

[3] Appellant asserts that the size of the jury pool and the number and sequence of peremptory challenges creates a "statistical" inference of purposeful discrimination. We reject the argument because the prosecutor used three peremptories to excuse African-American women but accepted a jury that included two African-American women and a male African-American.  The trial court memorialized its *Batson/Wheeler* findings as follows:  "Currently the defendant is a female African American.  Juror number three is a female African American, juror number ten, same thing, female African American, juror number 11 is a male African American.  And [juror] alternate number " one is a male African American."  Our Supreme Court has stated that the   "ultimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates 'good faith' in the use of peremptory challenges, and may show under all the circumstances no *Wheeler/Batson* violation occurred.  [Citation.]"  (*People v. Garcia* (2011) 52 Cal.4th 706, 747; see *People v Turner, supra,* 8 Cal.4th 137, 168 [prosecutor used four of six peremptories against African-Americans, but accepted a jury that, as impaneled, included five African-Americans].)

"'[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' [Citation.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1318.) Our courts have warned that comparative juror analysis on a cold appellate record may be misleading when the alleged similarities are not raised at trial. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 483 [170 L.Ed.2d 175, 184]; *People v. Lenix* (2008) 44 Cal.4th 602, 622.) That is the case here.

The prosecutor excused Prospective Jurors 6478, 8006, and 2342 because they had close family members with mental health issues and could be sympathetic to the defense. Appellant contends that the prosecutor should have excused Prospective Juror 2028 for the same reason and the failure to do so shows discriminatory purpose. We disagree. Prospective Juror 2028 stated that "my sister-in-law's brother is schizophrenic" but that is not the same as a close family member, i.e., a mother or an aunt (Prospective Juror 8006), a daughter (Prospective Juror 6478), or a close uncle and cousin (Prospective Juror 2341). The prosecutor was not concerned about a prospective juror's distant relative.

Appellant points out that Prospective Juror 4783 was depressed about her ex-fiance's infidelity but that is not the same as an ongoing mental health issue affecting the juror's ability to be fair. Unlike the other jurors who were excused, Prospective Juror 4783 did not have a close family member with a history of mental illness. Appellant makes no showing that the prosecutor was systematically excluding African-American women from the jury.

"Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales. . . " (*People v. Bonilla*, *supra,* 41 Cal.4th at p. 350.) A prospective juror may be excused based upon facial expressions, gestures, hunches and for arbitrary or idiosyncratic reasons, so long as the reason is not based on impermissible group bias. (*People v. Lenix, supra,* 44 Cal.4th at p. 613.)

" 'Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, [citation] and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.' [Citation.]  In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  "We have recognized that these determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province " ' [citations] . . . ."  (*People v. Lenix, supra,* 44 Cal.4th at p. 614.)  On review, we give great deference to the trial court in distinguishing bona fide reasons for sham excuses.  (*Ibid*.)

Here, the prosecutor excused any prospective juror who had a close family member with mental health issues.  Because of appellant's bizarre conduct, the prosecutor feared that such a juror would speculate about appellant's mental health and view her as a sympathetic figure.[4]  It was a legitimate concern.  (See e.g., *People v. Taylor, supra,*  48 Cal.4th at pp. 641, 644  [death penalty case; peremptory challenge of female African-American prospective juror who was psychiatric nurse].)  "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate,

---

[4] This was not the typical lover's spat.  Appellant pretended to be pregnant, disguised herself in a John McCain mask and white jumpsuit, and tried to kill Plato's common law wife and son by forcing her way into the house and drugging them. Appellant carried a clipboard with a murder script that said:  "I have been waiting for a long time for my husband, for my mate, my partner, my own, my dream.  But you will die here today." Appellant had a list of things to do such as "take the mom's [Angie's] head."  "Have her lick her lips, if you can pull out her tongue, and get some saliva and kiss the baby's [G.'s] forehead so it looks like the mom is kissing her baby good-bye before she kills him." In another note, appellant wrote, "get the baby's hand and make sure you scratch the mom so that her D.N.A and her blood is underneath [the baby's] fingernails so it looks like he is clawing mom's [Angie's] hand off while she is smothering him."

legitimate in the sense of being nondiscriminatory. '[A] "legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]' [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)

*Conclusion*

Having reviewed the jury voir dire record, we conclude that appellant simply did not persuade the trial court to draw the inference that peremptory challenges were used for a discriminatory purpose. (*People v. Taylor, supra,* 48 Cal.4th at pp. 642-643; *Johnson v. California, supra,* 545 U.S. at p. 168 [162 L.Ed.2d at p. 138].) "[T]he only basis for establishing a prima facie case cited by defense counsel was that the prospective jurors - like defendant - were Black. This is insufficient. [Citations.]" (*People v. Box* (2000) 23 Cal.4th 1153, 1189.)

Appellant twice failed to make a prima facie showing of group/racial bias. The record further shows that the prosecutor's reasons for excusing Prospective Jurors 6478, 8006, and 2342 were race-neutral and credited by the trial court. While statistics may play a role in establishing a prima facie case of discrimination, the trial court is permitted to consider a much wider range of factors, not only drawing upon its contemporaneous observations of the venire and voir dire, but also by considering the prosecutor's demeanor, how reasonable or improbable the reasons are and whether they have some basis in trial strategy, and the court's own experiences as a lawyer and bench officer. (*People v. Lenix, supra,* 44 Cal.4th at p. 613.)

We amplify on the cogent observations in *Lenix, supra*, and *Wheeler, supra*. In our view, appellate review of *Batson-Wheeler* claims is not suited to a pure academic or conventional inquiry. Of course, we follow the law as given to us by our Supreme Courts. Ideally, insightful appellate review is born of experience in picking a jury. Picking a jury is an art. It cannot be learned out of a book. The holdings of *Batson-Wheeler* should be tempered by considerations inherent in the subtle nature of picking a jury. "Judging" prospective jurors often turns on not just what the juror says, but on how he or she says it. There is body language to consider, inflection and tone of voice, facial

11

expressions, eagerness or nonchalance in answering questions, attire, tattoos, etc. These considerations will never appear on the record. But they most certainly are taken into consideration by counsel in picking a jury.

The very facts of this case illustrate just why our Supreme Courts have given "great deference" to the trial court's *Batson-Wheeler* decisions. The conventional wisdom is that no prosecutor should excuse a prospective juror who is a peace officer, let alone a police captain who is married to a sergeant in law enforcement. Does the fact that the police captain is an African American woman trump her years of law enforcement experience? Or is it the fact that she has a daughter with a history of mental illness that trumps her years of law enforcement experience? Appellate counsel isolates the *Batson-Wheeler* inquiry, focuses only on race, and contends that prospective juror 4678 should never have been excused by the prosecutor because it was based solely on race. If the trial court so found, no one could say that such a decision would be unreasonable or erroneous. Of course, an appellate court never sees these cases because a new jury is impaneled. Any prosecutor who exercises a challenge based solely upon race should, in our opinion, suffer consequences beyond the remedy provided by *Batson-Wheeler*. A prosecutor is a sworn law enforcement officer and an officer of the court. Circumventing the letter and spirit of Supreme Court cases is not consistent with a prosecutor's sworn duties.

But, appellate review should not "turn" on race in isolation. The prosecutor's articulated rationale, and the similar rationale for excusing other female African American prospective jurors with similar family "mental health issues," is not only reasonable, it is consistent with the stated goal of procuring an unbiased jury that has no experience with mental health issues. The trial court judge, with his years of felony trial experience, credited this explanation. This rings true. The prosecutor accepted the panel with two other female African American jurors. This hardly shows that the decisions to excuse the three jurors were motivated solely on race. (*People v. Scott, supra,* ___ Cal.4th at p. ___ [2015 DJDAR at p. 6239].)

12

The *Batson/Wheeler* "issue before us turns largely on an 'evaluation of credibility.' [Citation.] The trial court's determination is entitled to 'great deference,' [citation] and 'must be sustained unless it is clearly erroneous,' [citation]." (*Flekner v. Jackson* (2011) 562 U.S. __, __ [179 L.Ed.2d 374, 377].) No such showing has been made.

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

Charles A. Chung, Judge

Superior Court County of Los Angeles

_____

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyosi, Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.